**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

YVETTE ORIAKHI, HILARY BROWN, MIRANDA PIETRO, CLAUDIA KIRKPATRICK, LAUREN WOLF, ELIZABETH KNOX, JOHN NEFFERDORF, ROBERT BONKOWSKI, KEMI ADE, COURTNEY EMANUEL, KIMBERLY NAFF, XOCHITL GUZMAN, KAREN GEPFERT DWIGHT, KAREN ENGLISH, JEANNE LESTER, QUIANNA ZAETZ, TAMARA JONES, MARIE ELIZABETH GORMAN, BRIAN TROESCH, DEVINA DOTSON, JOHNNIE OWENS, KEELY PATTERSON, SUSAN BAXTER, LINDA FRILLING, JANET MADDO and ELIZABETH REMMEL, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

NATIONAL MILK PRODUCERS FEDERATION; AGRI-MARK, INC.; BONGARDS CREAMERIES; COOPERATIVE MILK PRODUCERS ASSOCIATION; DAIRY FARMERS OF AMERICA, INC.; LANCO DAIRY FARMS COOP, INC.; LONESTAR MILK PRODUCERS; MARYLAND & VIRGINIA MILK PRODUCERS COOPERATIVE D/B/A MAOLA LOCAL DAIRIES; MICHIGAN MILK PRODUCERS ASSOCIATION; MOUNT JOY FARMERS CO-OPERATIVE ASSOCIATION; NORTHWEST DAIRY ASSOCIATION D/B/A DARIGOLD; PRAIRIE FARMS DAIRY, INC.; TILLAMOOK COUNTY CREAMERY ASSOCIATION; UNITED DAIRYMEN OF ARIZONA; and DOES 1-100,

*Defendants*.

Civil Action No. __________

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

**Page**


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Plaintiffs ..... 6

1. Plaintiff Yvette Oriakhi ..... 6
2. Plaintiff Hilary Brown ..... 7
3. Plaintiff Miranda Pietro ..... 7
4. Plaintiff Claudia Kirkpatrick ..... 8
5. Plaintiff Lauren Wolf ..... 8
6. Plaintiff Elizabeth Knox ..... 8
7. Plaintiff John Nefferdorf ..... 9
8. Plaintiff Robert Bonkowski ..... 9
9. Plaintiff Kemi Ade ..... 10
10. Plaintiff Courtney Emanuel ..... 10
11. Plaintiff Kimberly Naff ..... 11
12. Plaintiff Xochitl Guzman ..... 11
13. Plaintiff Karen Gepfert Dwight ..... 11
14. Plaintiff Karen English ..... 12
15. Plaintiff Jeanne Lester ..... 12
16. Plaintiff Quianna Zaetz ..... 13
17. Plaintiff Tamara Jones ..... 13
18. Plaintiff Marie Elizabeth Gorman ..... 14
19. Plaintiff Brian Troesch ..... 14

20. Plaintiff Devina Dotson .......... 14

21. Plaintiff Johnnie Owens .......... 15

22. Plaintiff Keely Patterson .......... 15

23. Plaintiff Susan Baxter .......... 16

24. Plaintiff Linda Frilling .......... 16

25. Plaintiff Janet Maddo .......... 17

26. Plaintiff Elizabeth Remmel .......... 17

B. Defendants .......... 18

1. Defendant National Milk Producers Federation .......... 18

2. Defendant Agri-Mark, Inc. .......... 19

3. Defendant Bongards Creameries .......... 19

4. Defendant Cooperative Milk Producers Association .......... 19

5. Defendant Dairy Farmers of America, Inc. .......... 20

6. Defendant Lanco Dairy Farms Coop, Inc. .......... 20

7. Defendant Lonestar Milk Producers .......... 20

8. Defendant Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies .......... 21

9. Defendant Michigan Milk Producers Association .......... 21

10. Defendant Mount Joy Farmers Co-operative Association .......... 22

11. Defendant Northwest Dairy Association d/b/a Darigold .......... 22

12. Defendant Prairie Farms Dairy, Inc. .......... 22

13. Defendant Tillamook County Creamery Association .......... 23

14. Defendant United Dairymen of Arizona .......... 23

15. Defendants Does 1-100 .......... 23

IV. FACTUAL ALLEGATIONS .......... 24

A. National Milk Producers Federation and Cooperatives Working Together ........ 24

B. How the Collusive Mechanism Works ........ 26

C. Cooperatives Working Together and the Export Assistance Program ........ 28

1. The Export Assistance Program's Effect on the Domestic Supply of Milk ........ 36

D. The Export Assistance Program's Effect on the Price of Milk ........ 39

E. Additional Plus Factors Encouraging the Reasonable Inference of Defendants' Conspiracy ........ 41

1. The Relevant Market Is Concentrated ........ 41

2. The Relevant Market Has High Barriers to Entry ........ 43

3. Dairy Products Are Commodities ........ 44

4. The Demand for Dairy Is Inelastic ........ 45

5. Defendants Have Had Multiple Opportunities to Collude ........ 46

F. The Relevant Product Market ........ 48

G. Effect on the Upstream Milk Market ........ 49

H. The Relevant Geographic Market ........ 50

I. Antitrust Injury ........ 52

1. The Export Assistance Program Is Anticompetitive ........ 52

2. The Export Assistance Program Inflated Domestic Milk Prices ........ 54

3. Price Inflation Caused by the Export Assistance Program Was Passed Through to End Consumers ........ 56

4. Demand for the Relevant Products Permitted Pass-Through ........ 60

J. Defendants Are Not Entitled to the Capper-Volstead Act Exemption ........ 61

V. CLASS ALLEGATIONS ........ 63

COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1; Clayton Act § 16, 15 U.S.C. § 26 — Injunctive Relief Only) .................................. 66

COUNT II: VIOLATION OF STATE ANTITRUST STATUTES (Illinois Brick Repealer States) ........................................................................................................ 68

COUNT III: VIOLATION OF STATE CONSUMER PROTECTION STATUTES ........................................................................................................ 69

COUNT IV: UNJUST ENRICHMENT ........................................................................ 71

PRAYER FOR RELIEF ........................................................................................ 71

JURY TRIAL DEMAND ........................................................................................ 72

Plaintiffs Yvette Oriakhi, Hilary Brown, Miranda Pietro, Claudia Kirkpatrick, Lauren Wolf, Elizabeth Knox, John Nefferdorf, Robert Bonkowski, Kemi Ade, Courtney Emanuel, Kimberly Naff, Xochitl Guzman, Karen Gepfert Dwight, Karen English, Jeanne Lester, Quianna Zaetz, Tamara Jones, Marie Elizabeth Gorman, Brian Troesch, Devina Dotson, Johnnie Owens, Keely Patterson, Susan Baxter, Linda Frilling, Janet Maddo, and Elizabeth Remmel ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class"), by and through their attorneys, bring this class action complaint (the "Action") against Defendants National Milk Producers Federation ("NMPF"); Agri-Mark, Inc.; Bongards Creameries; Cooperative Milk Producers Association; Dairy Farmers of America, Inc.; Lanco Dairy Farms Coop, Inc.; Lonestar Milk Producers; Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies; Michigan Milk Producers Association; Mount Joy Farmers Co-operative Association; Northwest Dairy Association d/b/a Darigold; Prairie Farms Dairy, Inc.; Tillamook County Creamery Association; United Dairymen of Arizona; and Does 1-100 (collectively, "Defendants"), based upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief, including investigation of counsel, as follows:

## I. NATURE OF THE ACTION

1. Dairy is a critical source of protein and other nutrients to the average American consumer.[1] Plaintiffs and Class members are end consumers and indirect purchasers who bought

[1] In the dairy industry, dairy farmers, also referred to as "producers," sell raw milk to "handlers." Handlers, in turn, prepare the milk product for resale to consumers or serve as intermediaries to those who do. Consumer dairy products, such as fluid milk beverages, ice cream and cheese, can all be produced from "Grade A" or "fluid grade" raw milk. In the consumer market, however, milk beverages generally command a higher price than non-fluid products, which are known also as "manufactured dairy products." Consequently, the market into which dairy farmers sell their product values more highly (and pays a premium price for) Grade A milk ultimately used to produce beverage milk. This market premium based on end use creates an incentive among producers to divert their Grade A product to fluid milk handlers. Were this incentive not controlled,

dairy products at retail, and Defendants abuse the critical nature of those products by driving up the prices paid by consumers for dairy products domestically in order to reap supracompetitive returns.

2. Defendant National Milk Producers Federation ("NMPF") is a farm-commodity policy organization representing a majority of U.S. dairy-marketing cooperatives.[2] For decades, NMPF developed and ran a farmer-funded national program called "Cooperatives Working Together" ("CWT"); CWT continues to operate today under a rebranding called the NEXT Program (NMPF Export Program).[3] CWT is a cartel of dairy cooperatives and dairy producers that has been the subject of high-profile antitrust litigation previously.

3. CWT is a pun, because "cwt" is the abbreviation for hundredweight, the unit of measure that farmers use in order to sell their milk intended for dairy products. In the antitrust context, "Cooperatives Working Together" is also a pun, as Defendants' coordinated conduct constitutes a "contract, combination, or conspiracy" that restrains interstate commerce and causes end consumers and indirect purchasers, like Plaintiffs and members of the putative Class, to pay higher retail prices for dairy products.

---

lower market prices would result from the increased supply, thereby harming milk production revenues.

The dairy industry also is characterized by daily and seasonal fluctuations in supply and demand. Consumer demand fluctuates significantly on a daily basis, primarily due to consumer buying patterns. On the other hand, milk production, while relatively constant on a daily basis, does vary seasonally: in fall and winter months, less milk is produced; in spring and summer months, more milk is produced. *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 470 (7th Cir. 2009).

[2] *See* NMPF, *Cooperative Members*, https://www.nmpf.org/about/members/member-cooperatives/.

[3] To be clear, CWT is now known as the "NEXT Program"; but for clarity in this Complaint, the conspiracy will continue to be referred to as CWT. None of the substantive allegations change with respect to the conspiracy under the name the Defendants have given to the conspiracy itself.

4. Indeed, in the past, CWT has settled antitrust litigation for nearly $272 million with various sets of Plaintiffs over the last decade;[4] however, CWT continues to violate the antitrust laws, though in a different way than the previous allegations; according to CWT's chief executive officer Jim Mulhern in 2018, CWT "is a way for dairy farmers to help one another by giving support that boosts milk prices for everyone. And with the entire sector struggling with trade and economic challenges, this self-help effort is more important than ever… [s]o far this year [in 2018], CWT has helped member cooperatives capture contracts to sell nearly 1.3 billion pounds of milk equivalent. It all adds up to an improved balance of supply and demand – enough to improve the milk prices received by all U.S. dairy farmers by as much as $0.50/cwt., according to both external and internal estimates."[5]

5. Specifically, through CWT's export assistance program, members of CWT agree to use their voluntary contributions to subsidize each other's exports of dairy products to foreign markets. This functions somewhat like an export subsidy funded by a government, except that here the subsidy is funded by horizontal competitors agreeing to pay each other to increase their exports. This makes the program more anticompetitive on net, because it introduces no new capital to CWT members that might expand production in the way a government-funded subsidy does. As a result of these horizontal payments, CWT members divert dairy supply away from the domestic U.S. product markets for products like cheese and butter, without encouraging CWT as a whole to increase production. This directly reduces the domestic supply of such products and also diverts

[4] *First Impressions Salon v. NMPF*, Civil Action No. 3:13-cv-00454 (S.D. Ill.) which settled in 2020 for $220 million (class period: 2008 to 2013); *Edwards v. NMPF*, Civil Action No. 11-cv-04766-JSW (N.D. Cal.), which settled in 2016 for $52 million (class period: 2003 to 2016).

[5] Edairy News, *Cooperatives Work Together Helping Dairy Producer Bottom Line* (Dec. 6, 2018), http://web.archive.org/web/20201217063258/https://edairynews.com/en/cooperatives-work-together-helping-dairy-producer-bottom-line-62485/.

milk supply as an input to those products into foreign markets. As a consequence of this supply restriction, CWT achieves the stated purpose of Export Assistance: domestic prices rise above a competitive level for any U.S. dairy products that are either directly subject to CWT's Export Assistance or which use milk as an important input. These anticompetitive harms caused by export subsidies are sufficiently well known that the World Trade Organization has banned member nations from enacting export subsidies on agricultural products. CWT circumvents this ban by implementing the subsidy as a collusive rim of horizontal payments between CWT members. It is against any individual CWT member's unilateral self-interest to use their own profits to subsidize a horizontal competitor's exports but becomes collectively rational when the colluding firms share an expectation of reciprocity and Export Assistance causes a collective increase in domestic prices offsetting the cost of their voluntary contributions.

6. Through this mechanism, the CWT cartel works to artificially fix, maintain, suppress, or raise prices in the U.S. markets for dairy products such as (non-exhaustively) milk, cheese, and butter. CWT does this through the "Export Assistance Program," an effort whereby as much as 70% of the U.S.'s dairy-marketing cooperatives collude to impose supply restraints—namely, exporting massive amounts of dairy products in order to suppress domestic supply in an attempt to drive up domestic prices of all dairy products.[6] As a result of Defendants' unlawful acts, Plaintiffs and other indirect purchasers—everyday Americans that consume dairy products—who purchased cheese and other dairy products at retail have paid, and continue to pay, supracompetitive prices from January 1, 2018, to the present (the "Class Period").

[6] *See* CWT press release, *CWT Participation Surpasses 70%* (Nov. 30, 2011), https://web.archive.org/web/20220815162738/http://www.cwt.coop/cwt-participation-surpasses-70/.

7. The dairy distribution chain runs from dairy farmers and cooperatives, to processors and handlers, to distributors and retailers, and finally to consumers. Defendants' coordinated export and supply-restriction conduct artificially inflated prices at each level of that distribution chain, and those overcharges were passed through to end consumers who purchased dairy products at retail.

8. Thus, on behalf of themselves and all others similarly situated, Plaintiffs bring this lawsuit under the federal antitrust laws seeking injunctive relief as well as under antitrust and consumer protection statutes of states that permit indirect purchaser recovery (commonly known as *Illinois Brick*-repealer statutes), including but not limited to the laws of the states identified in Counts II and III, seeking actual and treble damages, as well as reasonable costs and attorneys' fees and pre- and post-judgment interest.

## II. JURISDICTION AND VENUE

9. ***Subject Matter Jurisdiction.*** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, 1332(d), and 1367, and Section 16 of the Clayton Act, 15 U.S.C. § 26. Federal question jurisdiction exists with respect to Plaintiffs' claims for injunctive and equitable relief under Section 1 of the Sherman Act and Section 16 of the Clayton Act. This Court also has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367. Jurisdiction is independently proper under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Class contains more than 100 members, and minimal diversity exists.

10. ***Venue.*** Venue is appropriate in this District under Sections 12 and 16 of the Clayton Act, 15 U.S.C. §§ 22 & 26, and 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants reside, are found, transact business, or have agents in this District; Defendants sold substantial quantities of dairy products in this District; Class members residing in this District and Division

purchased dairy products at artificially inflated prices in this District and Division; and a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this District.

11. ***Personal Jurisdiction.*** This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of dairy products throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

12. The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

13. No other forum would be more convenient for the parties and witnesses to litigate this case.

## III. PARTIES

### A. Plaintiffs

#### 1. Plaintiff Yvette Oriakhi

14. Plaintiff Yvette Oriakhi ("Plaintiff") is a citizen of New York.

15. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

16. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**2. Plaintiff Hilary Brown**

17. Plaintiff Hilary Brown ("Plaintiff") is a citizen of Illinois.

18. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

19. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**3. Plaintiff Miranda Pietro**

20. Plaintiff Miranda Pietro ("Plaintiff") is a citizen of Arizona.

21. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

22. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**4. Plaintiff Claudia Kirkpatrick**

23. Plaintiff Claudia Kirkpatrick ("Plaintiff") is a citizen of Nevada.

24. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

25. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**5. Plaintiff Lauren Wolf**

26. Plaintiff Lauren Wolf ("Plaintiff") is a citizen of Texas.

27. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

28. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**6. Plaintiff Elizabeth Knox**

29. Plaintiff Elizabeth Knox ("Plaintiff") is a citizen of Florida.

30. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were

made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

31. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**7. Plaintiff John Nefferdorf**

32. Plaintiff John Nefferdorf ("Plaintiff") is a citizen of Maryland.

33. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

34. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**8. Plaintiff Robert Bonkowski**

35. Plaintiff Robert Bonkowski ("Plaintiff") is a citizen of California.

36. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

37. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**9. Plaintiff Kemi Ade**

38. Plaintiff Kemi Ade ("Plaintiff") is a citizen of Maryland.

39. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

40. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**10. Plaintiff Courtney Emanuel**

41. Plaintiff Courtney Emanuel ("Plaintiff") is a citizen of Arizona.

42. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

43. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**11. Plaintiff Kimberly Naff**

44. Plaintiff Kimberly Naff ("Plaintiff") is a citizen of North Carolina.

45. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

46. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**12. Plaintiff Xochitl Guzman**

47. Plaintiff Xochitl Guzman ("Plaintiff") is a citizen of Illinois.

48. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

49. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**13. Plaintiff Karen Gepfert Dwight**

50. Plaintiff Karen Gepfert Dwight ("Plaintiff") is a citizen of North Carolina.

51. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were

made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

52. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**14. Plaintiff Karen English**

53. Plaintiff Karen English ("Plaintiff") is a citizen of Missouri.

54. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

55. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**15. Plaintiff Jeanne Lester**

56. Plaintiff Jeanne Lester ("Plaintiff") is a citizen of Iowa.

57. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

58. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**16. Plaintiff Quianna Zaetz**

59. Plaintiff Quianna Zaetz ("Plaintiff") is a citizen of New Hampshire.

60. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

61. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**17. Plaintiff Tamara Jones**

62. Plaintiff Tamara Jones ("Plaintiff") is a citizen of Minnesota.

63. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

64. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**18. Plaintiff Marie Elizabeth Gorman**

65. Plaintiff Marie Elizabeth Gorman ("Plaintiff") is a citizen of the District of Columbia.

66. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

67. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**19. Plaintiff Brian Troesch**

68. Plaintiff Brian Troesch ("Plaintiff") is a citizen of Illinois.

69. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

70. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**20. Plaintiff Devina Dotson**

71. Plaintiff Devina Dotson ("Plaintiff") is a citizen of Oregon.

72. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

73. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**21. Plaintiff Johnnie Owens**

74. Plaintiff Johnnie Owens ("Plaintiff") is a citizen of North Carolina.

75. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

76. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**22. Plaintiff Keely Patterson**

77. Plaintiff Keely Patterson ("Plaintiff") is a citizen of Arizona.

78. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT

Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

79. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**23. Plaintiff Susan Baxter**

80. Plaintiff Susan Baxter ("Plaintiff") is a citizen of West Virginia.

81. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

82. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**24. Plaintiff Linda Frilling**

83. Plaintiff Linda Frilling ("Plaintiff") is a citizen of Wisconsin.

84. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

85. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**25. Plaintiff Janet Maddo**

86. Plaintiff Janet Maddo ("Plaintiff") is a citizen of Maine.

87. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

88. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

**26. Plaintiff Elizabeth Remmel**

89. Plaintiff Elizabeth Remmel ("Plaintiff") is a citizen of Vermont.

90. Plaintiff, a consumer, made purchases at retail of dairy products for personal use during the Class Period. Throughout the Class Period, Plaintiff's purchases of dairy products were made at either artificially high or supracompetitive levels due to the Defendants' CWT/NEXT Program conspiracy, which aimed to increase the price that consumers would pay for dairy products.

91. Plaintiff was harmed by these artificially high or supracompetitively priced dairy products that were purchased—purchases that would have been priced more according to a competitive market had it not been for the CWT/NEXT Program conspiracy.

## B. Defendants

### 1. Defendant National Milk Producers Federation

92. Defendant National Milk Producers Federation is a trade association organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business at 2107 Wilson Boulevard, Suite 600, Arlington, Virginia 22201.

93. Cooperatives Working Together d/b/a NEXT is a voluntary, producer-funded national program developed by the National Milk Producers Federation to "strengthen and stabilize milk prices." While it is a separately funded program, CWT is organized within the operating structure of National Milk Producers Federation. CWT operates as an entity within the NMPF structure and is headquartered at NMPF's offices at 2107 Wilson Boulevard, Suite 600, Arlington, Virginia 22201. CWT consists of farmers in almost every state, producing as much as 70% of the nation's dairy products. The program recently was renamed NEXT but, for ease of understanding, the program is consistently referred to as CWT in this Complaint.

94. The CWT Committee is a component board encapsulated within CWT, and it establishes policies and oversees CWT's programs and activities. The CWT Committee consists of the NMPF Board of Directors, representatives from participating cooperatives that are not members of NMPF, and representatives for independent producer members of CWT.

95. NMPF manages CWT, which was formed for the primary purpose of effectuating output restraints, reducing supply to eliminate competition, and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program, which was founded in 2003 and committed to entirely in 2010 (initially NMPF ran CWT as a two-pronged program: (1) herd retirements, which restricted dairy supply through the reduction of the nation's dairy cow supply and (2) the Export Assistance program, which is the basis of this Action). The

herd retirements were ended as a result of the prior CWT litigation discussed herein; and, in 2010, NMPF changed CWT to solely be focused on the Export Assistance program.

**2. Defendant Agri-Mark, Inc.**

96. Defendant Agri-Mark, Inc. ("Agri-Mark") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

97. Agri-Mark is a dairy cooperative organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at 40 Shattuck Road, Suite 301, Andover, Massachusetts 01810.

**3. Defendant Bongards Creameries**

98. Defendant Bongards Creameries ("Bongards") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

99. Bongards is a dairy cooperative organized under the laws of the State of Minnesota, with its principal place of business at 250 Lake Drive East, Chanhassen, Minnesota 55317.

**4. Defendant Cooperative Milk Producers Association**

100. Defendant Cooperative Milk Producers Association ("CMPA") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to

eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

101. CMPA is a dairy cooperative organized under the laws of the Commonwealth of Virginia, with its principal place of business at 438 Tenth Street, Blackstone, Virginia 23824.

**5. Defendant Dairy Farmers of America, Inc.**

102. Defendant Dairy Farmers of America, Inc. ("DFA") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

103. DFA is a dairy cooperative organized under the laws of the State of Kansas, with its principal place of business at 1405 North 98th Street, Kansas City, Kansas 66111.

**6. Defendant Lanco Dairy Farms Coop, Inc.**

104. Defendant Lanco Dairy Farms Coop, Inc. ("Lanco") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

105. Lanco is a dairy cooperative organized under the laws of the State of Maryland, with its principal place of business at 1258 Maryland Ave., Hagerstown, Maryland 21740.

**7. Defendant Lonestar Milk Producers**

106. Defendant Lonestar Milk Producers ("Lonestar") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and

thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

107. Lonestar is a dairy cooperative organized under the laws of the State of Texas with its principal place of business at 813 8th St #300, Wichita Falls, Texas 76301.

**8. Defendant Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies**

108. Defendant Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

109. Maryland & Virginia Milk Producers Cooperative is a dairy cooperative organized under the laws of the State of Virginia with its principal place of business at 13861 Sunrise Valley Drive, Suite 220, Herndon, Virginia 20171.

**9. Defendant Michigan Milk Producers Association**

110. Defendant Michigan Milk Producers Association ("MMPA") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

111. MMPA is a dairy cooperative organized under the laws of the State of Michigan, with its principal place of business at 41310 Bridge Street, Novi, Michigan 48376.

**10. Defendant Mount Joy Farmers Co-operative Association**

112. Defendant Mount Joy Farmers Co-operative Association ("Mount Joy") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

113. Mount Joy is a dairy cooperative organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 1471 West Main Street Mount Joy, Pennsylvania 17552.

**11. Defendant Northwest Dairy Association d/b/a Darigold**

114. Defendant Northwest Dairy Association d/b/a Darigold ("Northwest Dairy") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

115. Northwest Dairy is a dairy cooperative organized under the laws of the State of Washington, with its principal place of business at 5601 6th Avenue South, Suite 300, Seattle, Washington 98108.

**12. Defendant Prairie Farms Dairy, Inc.**

116. Defendant Prairie Farms Dairy, Inc. ("Prairie Farms") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

117. Prairie Farms is a dairy cooperative organized under the laws of the State of Illinois, with its principal place of business at 3744 Staunton Rd. Edwardsville, Illinois 62025.

**13. Defendant Tillamook County Creamery Association**

118. Defendant Tillamook County Creamery Association ("Tillamook") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

119. Tillamook is a dairy cooperative organized under the laws of the State of Oregon, with its principal place of business at 4175 Highway 101 North, Tillamook, Oregon 97141.

**14. Defendant United Dairymen of Arizona**

120. Defendant United Dairymen of Arizona ("UDA") is a member of CWT. As such, it has agreed to and has in fact paid assessments of $0.02 per hundredweight of milk (cwt) produced to CWT in order to finance CWT's output restraints, reducing supply to eliminate competition and thereby strengthen and stabilize the prices of dairy products domestically through the "Export Assistance" program.

121. UDA is a dairy cooperative organized under the laws of the State of Arizona, with its principal place of business at 2008 South Hardy Drive, Tempe, Arizona 85285.

**15. Defendants Does 1-100**

122. Defendants Does 1-100 are potential additional defendants who are members of the CWT organization and whose identities will be ascertained through the discovery portion of this Action and added if necessary. Plaintiffs will seek leave to amend pursuant to Fed. R. Civ. P. 15 and 21 to add additional defendants when appropriate.

## IV. FACTUAL ALLEGATIONS

### A. National Milk Producers Federation and Cooperatives Working Together

123. The National Milk Producers Federation ("NMPF") was founded in 1916, "to foster an economic and political climate in which dairy producers and the cooperatives they own can thrive and prosper."[7] Jim Mulhern was the chief executive officer of the NMPF and also ran the CWT program.[8] CWT is a program "designed exclusively by America's dairy farmers for the benefit of America's dairy farmers."[9] According to CWT's website:

> It is a voluntary, producer-funded, marketing-focused, national program developed by the National Milk Producers Federation (NMPF), to assist family farmers. Launched in July 2003, CWT is, in effect, a federation of cooperatives and producers formed in accordance with the Capper-Volstead Act. CWT operates as an entity within the NMPF structure so that administrative costs and direct program (operational) costs can be kept to an absolute minimum.[10]

124. CWT uses its website (which includes CWT's bylaws and a list of member cooperatives) and the members of its cartel to recruit milk producers throughout the United States. CWT members include 15 dairy cooperatives[11] (as well as individual producers from across the country) that comprise as much as 70% of the dairy production in the United States.[12] Initially, CWT consisted of a two-pronged supply restraint program, the first being the Export Assistance

---

[7] NMPF, *About Us*, https://www.nmpf.org/about/about-nmpf/about-us/.

[8] Edairy News, *Dairy: Cooperatives Work Together Helping Dairy Producer Bottom Line* (Dec. 6, 2018), http://web.archive.org/web/20201217063258/https://edairynews.com/en/cooperatives-work-together-helping-dairy-producer-bottom-line-62485/.

[9] CWT, *What Is CWT?*, https://web.archive.org/web/20220815161215/http://www.cwt.coop/about-us/faqs/.

[10] *Id.*

[11] CWT, *Who Is Part of CWT?*, https://web.archive.org/web/20220126102120/https://www.cwt.coop/membership/.

[12] CWT, *CWT Participation Surpasses 70%* (Nov. 30, 2011), https://web.archive.org/web/20220815162738/http:/www.cwt.coop/cwt-participation-surpasses-70/.

Program, which is the subject of this Action. The second was the "Herd Retirement Program," discussed below.

125. From 2003 to 2010, CWT and its members engaged in a conspiracy through its "Herd Retirement Program," whereby participating dairy farmers agreed to kill all the dairy cows in their herds, thereby limiting raw farm milk production through this premature "herd retirement." The result of the conspiracy was to eliminate competition, reducing the number of dairy farmers in the market, and produce short- and long-term increases in the prices of raw farm milk, butter, and cheese. These supply restraints were the subject of litigation which has since settled.

126. On October 26, 2010, CWT voted to focus solely on export assistance, ending multiple rounds of cow "herd retirements."[13]

127. On June 8, 2011, CWT publicly announced that it will no longer fund "herd retirements" or "cow removals."[14] At the time, CWT made the following statement, which represented an agreement between Defendants to focus the cartel solely on exports:

> The members of Cooperatives Working Together (CWT) reiterated their support this week for a multi-year program to help boost U.S. dairy exports, and thus help improve the economics of dairy farmers, with the stipulation that the program must be supported by 70% of the nation's milk supply.
>
> At a meeting Tuesday in Alexandria, Virginia, the farmer-run committee overseeing CWT voted to renew the program for two years, starting in January 2012 and running through December 2013 – once a 70% level participation level can be reached. Current membership pledges amount to 68% of the milk supply.
>
> "Cooperatives Working Together remains an incredibly important self-help tool for the nation's dairy producers. The members of CWT want to keep it going into the future because it helps farmers access the fastest-growing markets for their milk, which are overseas," said Jerry Kozak, President and CEO of NMPF, which manages CWT.

[13] *First Impressions Salon v. NMPF et al.*, Civil Action No. 3:13-cv-00454 (S.D. Ill.), at ECF No. 182, Page ID #998.

[14] *Id.* at ECF No. 182, Page ID #999.

> "We fully expect the producer and cooperative community see the value in supporting a program that benefits every dairy farmer and that we will achieve our goal."
>
> Since the start of 2011, the program has used funds carried over from the previous year to help export 39 million pounds of cheese, to 20 countries. The renewal effort will ensure that the program will have new revenue coming in from its members starting next year to further bolster the export activities funded by CWT.
>
> The CWT program no longer funds herd retirements or cow removals, and will focus exclusively on assisting member organizations with dairy exports. Kozak noted that the export market "has been incredibly helpful to farmers in finding new homes for their milk output, but the loss of export markets in 2008 and 2009 illustrated what can happen when we aren't able to compete internationally. That's why CWT is so critical – it gives us a privately-run and funded enterprise that makes U.S. dairy exports competitive in global markets."
>
> Kozak said that an export-focused CWT program is an important complement to the proposed economic restructuring of dairy policy embodied by the reforms proposed in NMPF's Foundation for the Future program (the details of which can be found at www.futurefordairy.com). With approximately 15% of the nation's milk production headed for exports markets in 2011, "CWT will work in tandem with policy changes we want Congress to adopt to ensure that America's dairy farmers continue to have the ability to access and benefit from growing world demand for U.S. dairy products."
>
> Kozak said that at the next meeting of the CWT operating committee, in mid-November, the membership participation level will be assessed to verify that the 70% participation level has been reached. The two cent membership dues will subsequently start being collected in January 2012.[15]

## B. How the Collusive Mechanism Works

128. CWT "assists" exports by subsidizing them. This subsidy presently applies to anhydrous milkfat, butter and butter blends, natural cheeses, pasteurized process cheese, whole

[15] *See* NMPF, *CWT Members Support Two-Year Commitment at 70% of Production, Starting in 2012, to Assist Dairy Producers* (June 10, 2011), https://www.nmpf.org/newsletter/news-for-dairy-co-ops-june-2011/.

milk powder, ESL/aseptic fluid milk, cream, skim milk powder, and milk protein concentrate.[16] Historically, CWT's export assistance has covered a range of products that varied across years. Cheese, butter, anhydrous milkfat, and whole milk powder were assisted from at least 2011 onwards, and cream cheese was added as an eligible product in 2019.[17] To access the subsidy, members submit requests which are then reviewed by CWT.

129. Critically, the subsidy is funded by voluntary contributions made by CWT members as membership dues.[18] In practice, this means that horizontal competitors are effectively paying each other to divert supply from the domestic to the export market, sustaining a level of exports that is not competitively efficient.

130. This is not in members' unilateral self-interest, and only collectively rational if they are coordinating to increase domestic prices more than they are paying to subsidize each other's exports. In other words, it only makes sense for one dairy producer to subsidize a horizontally competing dairy producer's foreign exports when they both share an expectation of reciprocity and an expectation that their horizontal payments will cause an increase in domestic prices that offsets their contributions to CWT's Export Assistance Program (EAP).

131. The export subsidy raises domestic prices in two ways. Directly, it reduces the available domestic supply of products subject to EAP subsidies. Indirectly, it diverts fluid milk supply to exports of processed dairy products—this reduces the supply of fluid milk available for

---

[16] *See* NMPF, *About NMPF Exports & Trade (NEXT)*, https://www.nmpf.org/programs/next/.

[17] *See* NMPF, *2011 Activities & Accomplishments Report*, https://www.nmpf.org/wp-content/uploads/2018/12/2011-Activities-Accomplishments.pdf; NMPF, *2019 Activities & Accomplishments Report*, https://www.nmpf.org/wp-content/uploads/2020/03/2019-Annual-Report_FINAL.pdf.

[18] *See* NMPF, *About NMPF Exports & Trade (NEXT)*, https://www.nmpf.org/programs/next/; CWT, *Bylaws*, https://web.archive.org/web/20220521122837/http://www.cwt.coop:80/about-us/by-laws/.

domestic consumption, thereby increasing the domestic price of all products that require fluid milk as an essential input.

### C. Cooperatives Working Together and the Export Assistance Program

132. Much of what is known about the Export Assistance Program is as a result of CWT Defendants issuing press releases detailing the cartel's conduct with respect to exports.

133. According to Defendants, once the decision was made for CWT to focus solely on exports, the Export Assistance Program became extremely profitable for them. A fall 2012 update to members touted the benefits to Defendants of focusing their conspiracy solely on the mass export of milk. CWT stated as follows:

> **Making a difference in every producer's milk check**
>
> By assisting member cooperatives in selling dairy products overseas, CWT is having a significant impact on every dairy farmer's milk check. Analysis of CWT activity by Dr. Scott Brown, University of Missouri, indicates that CWT-assisted shipments of American cheese and butter as of September 30, 2012, have added an average of 43 cents per hundredweight of milk to the payments received by dairy farmers from first handlers.
>
> **68% of American cheese exports**
>
> Through the end of October 2012, CWT has assisted 10 member cooperatives in selling 106.3 million pounds of Cheddar, Monterey Jack, and Gouda cheese and 61.4 million pounds of butter and AMF to 36 different destinations. By providing assistance on basic commodities, the dollars dairy farmers representing 70% of U.S. milk production are investing are having the most direct, positive impact on farm-level milk prices as Dr. Brown's analysis shows.
>
> The graph to the left shows the distribution of the cheese CWT has assisted members in selling through the October 2012. Asia accounts for 42.5% of the cheese sold with sales to Japan 65% of that total. The Middle East ranks second at 23.8% of CWT-assisted cheese sales and Saudi Arabia makes up 36% of those sales.
>
> 94% of the cheese CWT has helped members sell through October 2012 is scheduled to be shipped and delivered before the end of the year.

**63% of butter exports**

Since CWT added butter and anhydrous milk fat (AMF) to the active list of products CWT is assisting members in selling overseas, 165 sales to 25 countries totaling 61.3 million pounds have been made. Considering that there is a reported world surplus of butterfat, CWT support of these sales has been a key factor in achieving this level of sales activity.

As the graph on the right shows, where CWT-assisted butter has been sold is very different from CWT-assisted cheese sales. The Middle East accounts for almost 73% of all butter sales while sales in Asia were 8.7% of the total. North Africa makes up 14.2% of all sales.

Of the 44.1 million pounds of butter sold in the Middle East, 28.8% has gone or will go to Saudi Arabia. Egypt's 13% share is equal to 5.7 million pounds of the butter sales to that region.

In North Africa, Morocco makes up 90% of the 8.5 million pounds of CWT-assisted sales to that region.

**CWT: A major factor in keeping supply in line with demand**

Through the end of July, the 60.7 million pounds of CWT-assisted cheese shipped made up 68.4% of U.S. American cheese exports and 16.9% of all U.S. cheese exports. During the same period, the 47.1 million pounds of CWT-assisted butter shipped made up 62.6% of U.S. butter exports. And, essentially all of that butter is at the world standard of 82% butterfat content.

Through September, U.S. milk production is running 3.6 billion pounds ahead of last year, a 2.5% increase in production. In an industry where a one percent increase can cause milk prices to fall, this year's level of growth could have resulted in even more dairy farmer economic stress.

Fortunately, CWT-assisted export sales of cheese, butter, AMF and whole milk powder through the end of October is the equivalent of 2.3 billion pounds of milk (on a milkfat basis) that has or will be going into foreign markets. So instead of an additional 3.6 billion pounds of milk coming onto the domestic market, thanks to CWT, that number is much more manageable.

Even after a new farm bill is passed and goes into effect, CWT will continue to play a critical role in helping to grow the stake that U.S. dairy farmers have made in the developing markets of Asia, the Middle East and North Africa.

> **Every member should get a member**
>
> Being an effective and consistent player in the world dairy market is critical to every dairy farmer and every dairy cooperative in the United States. Whether a cooperative exports products or not, the positive impact CWT has on sales of U.S. dairy products overseas has a positive impact on the domestic price for the products every cooperative sells.
>
> In addition to cooperatives encouraging other cooperatives to join CWT, dairy farmers need to encourage other dairy farmers to pitch in. Chances are that if your neighbor is shipping his or her milk to a proprietary plan, they aren't in CWT. Please take the time to ask them to join in.[19]

134. Defendants, in June of 2013, opted to commit to the program for an additional two-year period. In their press release announcing as such, they state:

> The members of Cooperatives Working Together (CWT) today endorsed a larger investment in the farmer-funded self-help program, voting to enhance the membership requirement from 2¢ per hundredweight to 4¢ per hundredweight, effective July 1, 2013, and running through December 31, 2015.
>
> The additional investment will cover the large increase in CWT member requests for export assistance in 2013, driven by increased demand in world dairy markets for U.S. American-type cheeses, butter, whole milk powder, and anhydrous milkfat.
>
> "Because of increased activity in 2013, the members decided to enhance CWT's revenue base in order to continue to successfully compete in world markets this year, and into the future," said Jerry Kozak, President and CEO of the National Milk Producers Federation (NMPF), which manages CWT.
>
> "As it starts its 11th year of operation, CWT remains the best self-help tool for the nation's dairy producers. Through today's decision, the members of CWT are recognizing how important CWT remains in help our farmers build access to the fastest-growing markets for their milk, which are overseas," said Kozak.

---

[19] CWT, *CWT Export Assistance Update – Fall 2012* (Nov. 15, 2012), https://web.archive.org/web/20220815163958/http://www.cwt.coop/cwt-export-assistance-update-fall-2012/.

> Since the start of 2011, the CWT Export Assistance program has helped member cooperatives sell 257.7 million pounds of American-type cheeses and 111.5 million pounds of butter to 39 countries on six continents.
>
> "With the export market growing at a rate five to eight times faster than the U.S. market, the vote by CWT's member cooperatives today will ensure the U.S. is a consistent and competitive supplier of dairy products in the world's growing dairy markets," said Kozak.
>
> The Cooperatives Working Together (CWT) Export Assistance program is funded by voluntary contributions from dairy cooperatives and individual dairy farmers. The money raised by their investment is being used to strengthen and stabilize the dairy farmers' milk prices and margins. For more information about CWT, visit www.cwt.coop.[20]

135. In 2015, after the previous agreement expired to continue the program, CWT decided to continue to offer the Export Assistance Program, as announced in a press release:

> The board of the National Milk Producers Federation (MPF) today voted to continue Cooperatives Working Together, the farmer-funded export assistance program, through 2018 at the current funding level of four cents per hundredweight. NMPF developed and manages the 13-year-old self-help program, also known as CWT.
>
> CWT's extension comes at a time of increasing U.S. milk production, declining world dairy prices and increased global competition due to the removal of European Union milk quotas.
>
> "With the United States exporting the equivalent of one-seventh of its milk production, today's vote will help ensure that this country remains a consistent and competitive supplier of dairy products to the world," said NMPF Board Chairman Randy Mooney, a dairy farmers from Rogersville, MO.
>
> * * *
>
> CWT is a voluntary membership program funded by contributions from 37 dairy cooperatives and more than 100 individual farmers. Together, CWT's members represent 70 percent of the milk

---

[20] CWT, *Cooperatives Working Together Members Commit to Additional Two-Year Program* (June 12, 2013), https://www.nmpf.org/cooperatives-working-together-members-commit-to-additional-two-year-program/.

> produced nationwide. The money raised from an assessment of four-cent-per-hundredweight on their milk production helps maintain U.S. exports when world prices are below U.S. prices.
>
> CWT's member cooperatives submit bids requesting help with sales in specific foreign markets. Only if the amount is justified is the bid accepted and financial assistance provided. The bidder then has six months to deliver the product to the overseas purchaser.
>
> In 2015 alone, CWT has helped its members contract to sell 35.1 million pounds of cheese, 26.6 million pounds of butter and 20.1 million pounds of whole milk powder. Together, these transactions will export the equivalent of 1.07 billion pounds of milk to customers in 28 countries on five continents.
>
> The NMPF board voted to continue CWT through December 31, 2018. For more information visit the CWT website.[21]

136. In June of 2018, the members of CWT agreed to continue the program for the next three years, through 2021:

> The NMPF Board of Directors voted in early June to continue the Cooperatives Working Together (CWT) program, the historic dairy farmer self-help export assistance effort.
>
> CWT's three-year extension, through 2021, comes at a time of growing U.S. milk production, weak global dairy prices and increased worldwide competition. CWT – developed and managed by NMPF – is the only program of its kind that enables farmers to use a private enterprise that increases the competitiveness of U.S. dairy exports. CWT is funded by dairy cooperatives and individual dairy farmers, who contribute $0.04/cwt. on their milk production.
>
> "CWT is a unique and highly cost-effective tool for America's dairy farmers, and the ongoing commitment of America's farmer-owned dairy cooperatives to the program sends a signal to dairy producers at home, and dairy exporters abroad, that the United States will maintain a strong competitive stance in the global dairy market," said NMPF Chairman Randy Mooney, a dairy farmer from Rogersville, Missouri.
>
> Through the first five months of 2018, CWT has facilitated the sale of 56 million pounds of dairy products, representing the equivalent

[21] http://www.cwt.coop/cwt-to-continue-offering-export-assistance-to-dairy-farmers-through-2018/ (last accessed July 27, 2021; link no longer available).

> of 649 million pounds of milk. Since the export assistance program's inception in 2003, it has helped members sell 887 million pounds of dairy products, the equivalent of more than 11.1 billion pounds of milk. For more information on CWT, visit www.cwt.coop.[22]

137. Collectively, each of these press releases represents an agreement by the Defendants to continue their conspiracy to restrain the domestic supply of milk. As discussed below, CWT's "revamping" into the NEXT program took place before July of 2025, which is when the NEXT program took over in its entirety.

138. To this day, Defendants' conspiracy continues to operate, which is made publicly known on their website, as follows:

> NEXT
>
> DAIRY EXPORTS
>
> ABOUT.
>
> NMPF Exports & Trade (NEXT) is a voluntary, export-focused program managed by NMPF and designed to support the sale of U.S. dairy products to overseas customers and seek a better alignment of supply and demand for milk and milk products at home. Member cooperatives provide the funding for NEXT by contributing 2 cents per hundredweight of milk marketed.
>
> NEXT positively impacts all U.S dairy farmers and cooperatives by fostering the competitiveness of U.S. dairy products in the global

[22] NMPF, *CWT Members Vote to Continue Export Assistance Program Through 2021* (June 13, 2018), https://www.nmpf.org/cwt-members-vote-to-continue-export-assistance-program-through-2021/.

marketplace and helping member cooperatives gain and maintain world market share for U.S. dairy products. As a result, the program has helped significantly expand the total demand for U.S. dairy products and the demand for U.S. farm milk that produces those products.

NEXT PROGRAM FAQ.

*Who is eligible to participate in NEXT?*

Fully participating NEXT member cooperatives marketing eligible products are qualified to apply for assistance from NEXT in exporting sales to eligible countries.

*What Products are Eligible for CWT Assistance?*

Anhydrous Milkfat (AMF)
Butter and Butter Blends
Natural Cheese(s)
Cheddar
Gouda
Colby
Monterey Jack
Swiss/Emmentaler
Cream Cheese
Pasteurized Process Cheese(s)
Whole Milk Powder
ESL/Asceptic Fluid Milk
Cream
Skim Milk Powder
Milk Protein Concentrate

*How does the NEXT bid process work?*

NEXT member cooperatives first submit a request for export assistance specifying the product to be exported, the quantity of the product, the end customer, the county in which the customer is located, and the requested amount of assistance.

NEXT staff analyzes each bid received, considering the market in which the product will be sold, the time of delivery, and global and U.S. product prices. When the level of assistance is economically justified, the bid is accepted. If the analysis indicates the assistance requested is not economical, the cooperative provided a counteroffer with the maximum level of assistance that NEXT will provide. The member cooperative then has the option to accept or reject the

> assistance offered. If the counteroffer is accepted, the bid id modified to reflect the level of assistance that NEXT will provide, assigned a reference number, dated and signed by the NEXT program faciliator.
>
> *When does the member cooperative receive the assistance payment?*
>
> Cooperatives do not receive payment from NEXT until documentation verifying product delivery to the end customer is received by NEXT. NEXT staff reviews the documents thoroughly, as required in the Export Assistance Operating Procedures. If the documentation is found to be in order, a request fot payment is submitted. Payment is typically made within 30 days of receiving the request for payment and the necessary supporting paperwork.
>
> *Do NEXT-Assisted Export Sales displace sales made without assistance?*
>
> NEXT aims to expand sales of U.S. dairy products in world markets, not displace existing sales. If NEXT receives a claim that its assistance has displaced an unassisted export sale of a U.S. dairy product, the claim is thoroughly investigated.
>
> MEMBERSHIP.
>
> The NEXT program helps member cooperatives secure export sales of dairy products and supports member efforts to gain and maintain global market share. As a result, U.S. dairy farmers and their cooperatives benefit from these efforts to increase global demand for U.S. dairy products. The program is funded by voluntary contributions from dairy cooperatives. All dairy cooperatives should consider investing in NEXT.[23]

139. According to now-NMPF President & CEO Gregg Doud, on August 3, 2026, NEXT's first full year revamped from CWT was "something to celebrate."[24] "NEXT improves on [CWT] in multiple ways" because it is "more targeted, more flexible, and more transparent, with clear benefits that show through positive effects for its members."[25] From July 2025 through July

---

[23] NMPF, About NMPF Exports & Trade, https://www.nmpf.org/programs/next/ (last accessed Oct. 5, 2026).

[24] NMPF, Latest News, *The Past Year Has Been a Great NEXT Year* (Aug. 3, 2026), https://www.nmpf.org/the-past-year-has-been-a-great-next-year/.

[25] *Id.*

2026, "NEXT committed export assistance on more than 315 million pounds of dairy products destined for international markets. That's a 73% greater volume than in 2024, the last year of the CWT program, at a cost to its members that's half of the CWT assessment."[26]

**1. The Export Assistance Program's Effect on the Domestic Supply of Milk**

140. Due to the Defendants' and co-conspirators' output restrictions, the prices of raw milk (including both the "regulated" minimum price and the over-order price), butter, cheese, and other dairy products throughout the Class Period were supracompetitively higher than they would have been in a normal, functioning competitive market.

141. By way of background, the four regulatory categories of milk are defined by the end-use of the milk or dairy product:

> **Class I –** Raw milk intended for use in making fluid milk products, such as whole milk, skim milk, cream, and the like;
>
> **Class II –** Raw milk intended for use in the manufacture of soft or "spoonable" dairy products, such as yogurt and cottage cheese;
>
> **Class III –** Raw milk intended for use in producing hard and spreadable cheeses, such as cream cheese or cheddar cheese; and
>
> **Class IV –** Raw milk intended for use in manufacturing other dairy products, such as butter, evaporated milk, non-fat dry milk, and whey.

142. The Federal Milk Marketing Orders ("FMMOs") establish the minimum dairy prices "which those who process dairy products, designated as handlers … must pay the dairy farmers, designated as producers" for each of the four aforementioned categories of milk and dairy products.

143. The FMMOs are a set of regulatory formulae used to calculate the minimum price of raw milk paid to producers for each of these four product classifications. The FMMO formulae

[26] *Id.*

are predicated on the longstanding regulatory determination that Class III and Class IV products—primarily butter, cheese, non-fat dry milk, and whey—compete in a national market. Accordingly, the FMMO formulae specify as the minimum price of milk the average nationwide open market price for butter, cheese, nonfat dry milk, and whey minus a "make allowance" multiplied by a yield factor. Depending on the time period involved, the average nationwide free market prices for cheese, butter, and non-fat dry milk are determined by the USDA's National Agricultural Statistics Service ("NASS") based on either the prices of dairy commodities on established and specified public exchanges or the results of weekly market surveys conducted by NASS pursuant to the Dairy Market Enhancement Act of 2000, 7 U.S.C. § 1637 et. seq. The "Make Allowance" utilized in the FMMOs is "intended to represent the costs to the handlers of making the end dairy products from raw milk." Both the Make Allowance and the Yield Factor are fixed by regulation and "are uniform through the country because [of the] USDA determination that manufactured dairy products compete in a national market."

144. Federal regulation of milk pricing has three important limitations.

145. First, "[a]lthough the AMAA mandates a minimum price, it does not mandate a maximum price." "Congress specifically left the determination of milk prices above [the FMMO] floor to market forces." The amount by which the actual, agreed-upon price for the sale of milk exceeds the minimum price fixed by the applicable FMMO is often referred to as the "over-order premium." A seller's opportunity to charge over-order premiums is determined by market forces. Where a seller has substantial market power and the supply of milk is constricted, the seller will be able to extract a premium to satisfy a buyer's demand for milk. Market power is enhanced when agricultural cooperatives conspire to engage in activities to raise prices and when milk production is reduced by collusive cooperative strategies.

146. Second, the FMMOs issued pursuant to the AMAA are only intended to regulate the price of raw milk. Federal law does not regulate the price of products manufactured from raw milk, such as butter and cheese.

147. Third, the AMAA is based on the premise that federally mandated minimum prices for raw milk will be beneficial to the public if and only to the extent that farmers continue to make production decisions individually without horizontal collusion. Thus, the statute explicitly prohibits the inclusion of any output restriction in any Milk Marketing Order issued by the Secretary of Agriculture. *See* 7 U.S.C. § 608c(5)(g). Output restrictions are permitted under the AMAA only to the extent specifically authorized by the Secretary of Agriculture after due notice and an opportunity for hearing. *See* 7 U.S.C. § 608b(a).

148. Upon information and belief, there are no output restrictions permitted under the AMAA and authorized by the Secretary of Agriculture which apply to the Cooperatives Working Together Export Assistance program.

149. In this context, the Export Assistance Program was highly effective at diverting U.S. dairy from domestic consumption to international exports. The aggregate impact of the Defendants' Export Assistance program can be seen in the U.S.'s total exports of cheese, both in terms of percentage of production and the total exports by volume, from 1996 through 2024:




150. As can be seen on the chart above, the percentage of production of the dairy supply which is exported increased sharply when the program was established in 2003; then, when CWT doubled down in 2010, exports increased sharply once again; and exports have continued increasing through the Class Period.[27]

**D. The Export Assistance Program's Effect on the Price of Milk**

151. The acknowledged dynamics of the dairy market are such that a substantial decrease in the supply of raw milk produces an immediate upward effect on the unregulated market price of butter and cheese in the national wholesale market for such dairy products. This price increase is automatically reflected in an increase in the regulated minimum price of raw milk as a consequence of the FMMO formulae. In addition, a significant restriction in the supply of raw

[27] USDA Economic Research Service, *Dairy Data*, https://ers.usda.gov/data-products/dairy-data; USDA National Agricultural Statistics Service, *Quick Stats*, https://quickstats.nass.usda.gov/.

milk will necessarily result in an increase in the regulated minimum price of raw milk and the unregulated over-order price of raw milk, the unregulated price of butter and the unregulated price of cheese.

152. In turn, the elimination of the supply of milk through converting it to cheese and other dairy products and then exporting it en masse had the necessary and intended effect to increase the unregulated price of those products in the national market.

153. These intended effects can also be seen in the econometric analysis within the CWT organization. The following chart shows the impact and effect of the Export Assistance Program on milk prices from 2004 to 2009.




154. These intended effects have gotten even more significant since this chart was made because, in 2010, as this Action states, CWT doubled down its commitment to Export Assistance after they were sued alleging similar allegations and effects due to the Herd Retirement program.

155. In NMPF's 2018 Activities and Accomplishments Report, Defendants stated: "By focusing CWT assistance on products that most directly impact dairy farmers' milk prices, CWT

sales over the last seven years have improved dairy farmer milk prices by an estimated average of $0.36/cwt. per year – a return nine times the investment that CWT member producers have made in the program." This statement is an assertion that Defendants intended to target specific dairy products through their program that would affect the price of raw milk most significantly and estimated that this targeting produced a large effect.[28]

## E. Additional Plus Factors Encouraging the Reasonable Inference of Defendants' Conspiracy

### 1. The Relevant Market Is Concentrated

156. While there are over two dozen members of the CWT cartel, the majority of production of dairy in the United States is highly concentrated.

157. CWT member and Defendant Dairy Farmers of America produces nearly a third of the entire United States' fluid milk. Additionally, according to Dairy Farmers of America, they are "the largest supplier of raw milk in the world, the third largest global dairy company, and the largest U.S. dairy company."[29] This is due in part to heavy consolidation by Dairy Farmers of America and an aggressive merger strategy, which (during the Class Period) has included acquisitions of two major horizontal competitors, St. Albans Creamery in Vermont as well as Dean Foods, which is dispersed throughout the entirety of the United States.

158. The acquisition of Dean Foods drew concerns that Dairy Farmers of America was growing into an unmanageable monopoly in the Relevant Market; and it even drew a forced

[28] NMPF, *2018 Activities & Accomplishments Report*, https://www.nmpf.org/wp-content/uploads/2019/04/AAReport18web.pdf.

[29] DFA, *Working for a Cooperative*, https://web.archive.org/web/20220702121541/https://www.dfamilk.com/careers/what-is-a-cooperative.

divestiture by the United States Department of Justice,[30] as well as antitrust litigation under the monopolization cause of action, 15 U.S.C. § 2, set forth in the Sherman Antitrust Act.[31]

159. There has been significant consolidation among dairy cooperatives. Since the late 1920s, the number of U.S. dairy cooperatives has fallen from more than 2,400 to 89 as of 2022, a decline of over 96%. In 2022, these 89 cooperatives accounted for 87% of marketed milk and milk products in the United States.[32]

160. More broadly, this consolidation extends to the farms themselves. Between 2002 and 2022, the number of dairy farms with fewer than 1,000 cows declined, while the number of farms with 1,000 or more cows increased by around 60%. Herd size grew substantially as well, with the average U.S. dairy operation rising from 112 cows in 2000 to 283 cows in 2021. As herds grew larger in size, the total number of licensed dairy herds in the United States fell sharply by 63%, from 66,825 in 2004 to 24,811 in 2024.[33]

161. These changes in the market mean more milk is produced overall, only from fewer farms. U.S. farmers had 9.3 million milk cows at the end of 2022, down only 2.4% from 2017.

[30] *See generally*, *United States of America et al. v. Dairy Farmers of America*, Case No. 1:20-cv-02658 (N.D. Ill. 2020); DOJ press release, *Justice Department Requires Divestitures as Dean Foods Sells Fluid Milk Processing Plants to DFA out of Bankruptcy* (May 1, 2020), https://www.justice.gov/opa/pr/justice-department-requires-divestitures-dean-foods-sells-fluid-milk-processing-plants-dfa.

[31] *See generally*, *Food Lion, LLC et al. v. Dairy Farmers of America, Inc. et al.*, Civil Action No. 1:20-cv-00442 (M.D.N.C. 2020).

[32] Congressional Research Service, *Overview of Dairy Cooperatives* (Nov. 26, 2024), https://www.congress.gov/crs_external_products/R/PDF/R48285/R48285.1.pdf.

[33] USDA Economic Research Service, *Fewer Farms, More Milk: The Changing Structure and Costs of U.S. Dairy Farming* (Feb. 23, 2026), https://www.ers.usda.gov/amber-waves/2026/february/fewer-farms-more-milk-the-changing-structure-and-costs-of-us-dairy-farming.

Over the same five-year period, the number of farms selling milk from cows fell by 39%, even as total cow milk sales rose by 44%.[34]

162. Additionally, other members of CWT have dominant positions in the Relevant Market in their respective geographic area. For example, St. Albans Creamery, which is owned by Dairy Farmers of America, has a strong foothold as a cooperative of farms in the New England region—specifically, Vermont.

**2. The Relevant Market Has High Barriers to Entry**

163. Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market and make it easier for incumbents to collude.

164. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supracompetitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

165. Barriers to entry have kept and continue to keep would-be competitors out of the Dairy industry—the construction of plants/processing centers, the high cost and need to transport Dairy products quickly due to their perishability, the time and space requirements needed to raise cows for milk production for Dairy products, and the high cost that comes with marketing Dairy products for sale to end users, like Plaintiffs and members of the putative Class.

166. Relative insulation from the threat of new competitors has enabled the Defendants to maintain their conspiracy through CWT and potentially other means which may be discoverable through the discovery portion of this Action.

---

[34] USDA 2022 Census of Agriculture, *Dairy Cattle and Milk Production*, https://www.nass.usda.gov/Publications/Highlights/2024/Census22_HL_Dairy.pdf.

**3. Dairy Products Are Commodities**

167. A commodity is a basic good or item used in commerce which is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods.

168. Milk is a commodity.

169. For example, the milk produced by the Defendants is virtually indistinguishable in appearance and have nearly identical nutritional content. The USDA recognizes dairy products as commodities—listing the daily cash trading of butter, cheese, nonfat dry milk, and dry whey on the USDA's website.[35]

170. Commodities-based markets have recognized other dairy products, such as cheese, as a commodity; for example, blocks of cheddar cheese are commodities bought and sold on the Chicago Mercantile Exchange.[36]

171. Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily, if not exclusively, on price as opposed to other attributes such as product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors.

172. Any observed price discrepancies for commodities are more likely to expose cheating because they cannot as readily be attributed to other factors such as special product features, quality, reliability and durability.

---

[35] USDA Agricultural Marketing Service, *Chicago Mercantile Exchange - Cash Dairy Markets*, https://www.ams.usda.gov/market-news/chicago-mercantile-exchange-cash-dairy-markets.

[36] *See* Cheese Market News, *Daily/Weekly Market Activity*, https://www.cheesemarketnews.com/markets/dailymarkets.html.

**4. The Demand for Dairy Is Inelastic**

173. Price elasticity describes the sensitivity of suppliers or consumers to changes in the price of a good or service. Demand is inelastic if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product.

174. Under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, and they continue to purchase despite a price increase.

175. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices; otherwise, increased prices would result in declining sales, revenues, and profits as customers purchase substitute products or decline to buy altogether.

176. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

177. Dairy demand is relatively insensitive to price changes. "[D]emand for dairy products is relatively inelastic at the aggregate level[.]"[37] Consumers and other purchasers, like Plaintiffs and members of the putative Class, buy dairy products in a market where demand for those products is relatively inelastic. Indeed, "[a]s a general rule, the demand for dairy products is rather inelastic as most of the studies report price elasticity lower than 1."[38]

178. Studies using data on the U.S. market confirm this. A research paper analyzing demand for farm milk in the United States estimated an own-price elasticity of demand of approximately -0.80.[39]

---

[37] Zohra Bouamra-Mechemache, Vincent Requillart, Claudio Soregaroli, and Audrey Trevisiol, *Demand for dairy products in the EU*, Toulouse School of Economics (Nov. 2007), http://idei.fr/sites/default/files/medias/doc/wp/2007/eu_dairy_demand.pdf.

[38] *Id.*

[39] Wei Zhang and Julian M. Alston, *The Demand for Inputs and Technical Change in the U.S. Dairy Manufacturing Industry*, Agricultural and Resource Economics Review (2018),

179. Defendants' own position agrees with this characterization of the inelastic demand for dairy products. Dr. Scott Brown, testifying on behalf of NMPF in the 2023-24 National Federal Milk Marketing Order Pricing Formula Hearing, submitted own-price elasticities of demand by product: butter, -0.08; American cheese, -0.23; cheese other than American, -0.22; fluid milk, -0.12; nonfat dry milk, -0.13; other milkfat, -0.12; and other skim solids, -0.05. Each of these figures is below 1.0 in absolute value, confirming that demand for each category of dairy product at issue is inelastic.[40]

180. This means that, despite the increases in price as a result of the conspiracy, Plaintiffs and members of the Class were and are still compelled to buy dairy products because there are no suitable replacements.

**5. Defendants Have Had Multiple Opportunities to Collude**

181. The Defendants have had opportunities to collude in the Relevant Market. These opportunities to collude include but are not limited to:

a. Trade association meetings between the Defendants;

b. Joint annual meetings held by NMPF, include but are not limited to:

i. The joint annual meeting attended by some or all of the Defendants or their representatives in Las Vegas which was held on November 14-17, 2021.[41]

---

https://www.cambridge.org/core/journals/agricultural-and-resource-economics-review/article/demand-for-inputs-and-technical-change-in-the-us-dairy-manufacturing-industry/CE21B9A47917A404C7EED6CAC7394960.

[40] Scott Brown, Ph.D., Univ. of Missouri College of Agriculture, Food & Nat. Res., *Analysis of Federal Milk Market Order Policy Options*, https://www.ams.usda.gov/sites/default/files/media/FMMO_NMPF_60A.pdf.

[41] Joint Annual Meeting webpage, November 14-17, 2021, https://web.archive.org/web/20211213014202/https://annualmeeting.dairy.org/#/Summary.

ii. The joint annual meeting attended by some or all of the Defendants or their representatives in Denver which was held on October 23-26, 2022.[42]

iii. The joint annual meeting attended by some or all of the Defendants or their representatives in Orlando which was held on November 13-15, 2023.[43]

iv. The joint annual meeting attended by all or some of the Defendants or their representatives in Arlington, Texas which was held on Nov. 10-12, 2025.[44]

v. The joint annual meeting attended by all or some of the Defendants or their representatives in Kissimmee, Florida which is to be held on October 19-21, 2026.[45]

c. Calls and messages between the Defendants;

d. Emails between the Defendants;

e. Joint ventures between the Defendants, including (a) the joint venture between the horizontal competitors who are Defendants in this Action, Dairy Farmers of America and Select Milk Producers, Inc. to supply dairy products out of a shared facility in St. Johns, Michigan, after the completion of that facility in the fall of 2020;[46] and (b) the joint venture between horizontal competitors Defendant Dairy Farmers of America and California Dairies, Inc.;[47]

---

42 Joint Annual Meeting webpage, October 23-26, 2022, https://web.archive.org/web/20230402112016/https:/annualmeeting.dairy.org/#/Summary#%2FSummary.

43 Joint Annual Meeting webpage, November 13-15, 2023, https://web.archive.org/web/20231207095820/https:/annualmeeting.dairy.org/#/Summary#%2FSummary.

44 Joint Annual Meeting webpage, November 10-12, 2025, https://www.nmpf.org/tag/2025-joint-annual-meeting/.

45 Joint Annual Meeting webpage, October 19-21, 2026, https://web.cvent.com/event/7f55714c-4baa-4b83-9d12-f83cc1756a6f/summary#/Summary

46 *See* "DFA reports 2020 financial results" (Mar. 29, 2021), https://www.feedstuffs.com/market-reports/dfa-reports-2020-financial-results.

47 *See* California Dairies, Inc., *California Dairies, Inc. and Dairy Farmers of America Create a Marketing Agency in Common to Ensure Market Stability* (July 10, 2019), https://www.californiadairies.com/press-release/california-dairies-inc-and-dairy-farmers-of-america-create-a-marketing-agency-in-common-to-ensure-market-stability/.

f. Consolidation by the Defendants, including the acquisition of Dean Foods by Defendant Dairy Farmers of America during the Class Period[48] and the acquisition of St. Albans by Defendant Dairy Farmers of America during the Class Period; and[49]

g. Through reports exchanged between the Defendants, including NMPF's reports, podcasts, and other statements to its members, many of which consist of the Defendants.[50]

## F. The Relevant Product Market

182. The Relevant Product Market includes the markets for the processed dairy products for which Defendants provided export assistance during the Class Period, along with the upstream pasteurized milk market. This includes the markets for pasteurized milk, cheese, butter, whole milk powder, cream cheese, and anhydrous milkfat (collectively, the "Relevant Products") sold throughout the entirety of the United States.

183. Each Relevant Product is a finished dairy product that uses fluid milk as an input, but each constitutes a separate product market. Purchasers of butter, cheese, whole milk powder, cream cheese, and anhydrous milkfat do not treat these products as reasonably interchangeable with one another.

a. ***Butter.*** In *United States v. Dairy Farmers of America, Inc. et al.*, the DOJ argued that butter constitutes its own relevant product market, distinct from margarine and other potential substitutes, as butter possesses "specific characteristics (e.g., flavor, texture, certain cooking attributes, and blending abilities), unmatched by other products." The DOJ further stated that "if the price of butter were increased by a small but significant amount,

48 *Id.*

49 *See* American Agriculturist, *St. Albans Creamery Co-op joins Dairy Farmers of America* (Aug. 5, 2019), https://www.farmprogress.com/dairy-cattle/st-albans-creamery-co-op-joins-dairy-farmers-of-america.

50 *See, e.g.*, NMPF, *Dairy Defined Podcast: Price Forecast Positive for Dairy*, *NMPF's Vitaliano Says* (Jan. 10, 2022), https://www.nmpf.org/dairy-defined-podcast-price-forecast-positive-for-dairy-nmpfs-vitaliano-says/.

a sufficient number of purchasers would not switch to other products to make such a price increase unprofitable."[51]

b. ***Cheese.*** Defendants' export assistance program provides assistance for natural cheese, specifically Cheddar, Gouda, and Monterey Jack cheese. In *United States v. B.S.A. S.A. (Lactalis) and The Kraft Heinz Company*, the DOJ argued that feta cheese and ricotta cheese each constitute their own separate relevant product markets, distinct from other natural cheese varieties in line with how suppliers and the industry recognize these specialty products. [52] American cheeses are not subject to similar industry-level distinction; the National Agricultural Statistics Service classifies Cheddar and Monterey Jack, under a single reporting category of "American types" of cheese. Gouda is classified separately, given its European-style cheese characteristics. Therefore, Defendants' export assistance for cheese affects two relevant product markets, American-type cheese (comprising Cheddar and Monterey Jack) and Gouda.

c. ***Whole Milk Powder, Cream Cheese, and Anhydrous Milkfat.*** Whole milk powder, cream cheese, and anhydrous milkfat, the additional dairy products for which Defendants provided export assistance, similarly constitute separate relevant product markets, each distinct from the Relevant Products described above and from one another.

## G. Effect on the Upstream Milk Market

184. In *United States et al. v. Dairy Farmers of America, Inc. and Dean Foods Company*, the DOJ states that "the processing and sale of fluid milk is a relevant product market and line of commerce under Section 7 of the Clayton Act." Fluid Milk is characterized by inelastic demand,

---

[51] *United States v. Dairy Farmers of America, Inc., Société de Diffusion Internationale Agro-Alimentaire, and SODIAAL North America Corp.*, Civil Action No. CN00-1663 (E.D. Pa. 2000).

[52] *United States v. B.S.A. S.A. (Lactalis) and The Kraft Heinz Company*, Civil Action No. 1:21-cv-02976 (D.D.C. 2021).

and "a hypothetical monopolist processing and selling fluid milk likely would impose a small but significant and non-transitory price increase (e.g., five percent) because an insufficient number of customers would switch to alternatives to make that price increase unprofitable."[53]

185. Milk is an essential upstream input from which all dairy products are manufactured. It can be allocated according to the relative profitability of specific manufactured dairy products or kept as fluid milk and sold into the market. By subsidizing the export of certain manufactured dairy products, Defendants' program improved the profitability of converting raw milk into processed dairy products that are ultimately exported rather than sold domestically, incentivizing the diversion of raw milk away from the downstream fluid milk market and domestic processed dairy. This reallocation reduced the raw milk supply available for all downstream markets, increasing the price of raw milk and, in turn, the price of all products manufactured from raw milk in the domestic market.

**H. The Relevant Geographic Market**

186. The Relevant Geographic Market constitutes the entirety of the United States. This is consistent with USDA's longstanding regulatory treatment of dairy product markets. As set forth above, the Make Allowance and Yield Factor used in the FMMO formulae are uniform nationwide because of USDA's determination that manufactured dairy products compete in a national market. Defendants' export assistance program was likewise national in scope. CWT consists of numerous member cooperatives across the United States, that collectively account for a substantial share of domestic milk supply.

---

[53] *See Proposed Final Judgment and Competitive Impact Statement*, https://www.federalregister.gov/documents/2020/06/02/2020-11857/united-states-et-al-v-dairy-farmers-of-america-inc-and-dean-foods-company-proposed-final-judgment.

187. The domestic market in the U.S. is a distinct geographic market from foreign export markets. Neither direct purchasers of dairy products from the Defendants nor end consumers can readily substitute dairy products in the U.S. with those available in foreign markets. As a result, a hypothetical monopolist in the U.S. of each of the previously defined product markets could profitably raise prices 5-10% above a competitive level without meaningful substitution to foreign dairy products.

188. This arises in part from import regulations and is confirmed by the USDA. Practically speaking, resellers and consumers cannot simply choose to purchase milk and dairy products from a foreign nation because these products are perishable and subject to import restrictions. Specifically, the U.S. federal government imposes a variety of import restrictions on milk and dairy products that apply both to importers and to individual travelers.[54] The stated purpose of these restrictions is both to protect the domestic dairy industry and to control the spread of disease. As a consequence, the USDA defines a nationwide market that does not include foreign dairy producers.[55]

189. Of the dairy products that are imported to the U.S. from overseas, many are specialized products that compete in distinct product markets. For example, Italian parmesan imported to the U.S. is in a distinct product market from American cheddar because it is used for

[54] *See* USDA Animal and Plant Health Inspection Service, *International Traveler: Milk, Dairy, and Egg Products*, https://www.aphis.usda.gov/traveling-with-ag-products/milk-dairy-eggs; 9 CFR § 94.16 Milk and milk products, https://www.ecfr.gov/current/title-9/chapter-I/subchapter-D/part-94/section-94.16; U.S. Customs and Border Protection, *What are the regulations for importing dairy products?*, https://www.help.cbp.gov/s/article/Article-1071?language=en_US.

[55] *See* Dep't of Agriculture, AMS Final Decision, 78 Fed. Reg. 9248 (Feb. 7, 2013), "Cheese, butter, dry whey and NFDM compete in a national marketplace," https://www.govinfo.gov/content/pkg/FR-2013-02-07/pdf/2013-02623.pdf; AMS Recommended Decision, 82 Fed. Reg. 10634, 10667 (Feb. 14, 2017), "commodity products produced in California compete in the same national market as products produced throughout the country," https://www.govinfo.gov/link/fr/82/10634.

distinct culinary purposes and consequently has limited elasticity of demand between the two products. In other words, many of the dairy products which are imported to the U.S. are imported precisely because they are a distinct product from those made by U.S. producers. This is what justifies the high cost of importing such dairy products to the U.S. market. As a consequence, summing all dairy imports to the U.S. and assuming such imports compete with Defendants in a relevant market would be a mistake that understates U.S. producers' market power.

190. While the domestic markets are related to foreign markets and their prices/production may affect one another (as CWT's Export Assistance does), that is not the question asked of market definition in antitrust litigation. Defining a relevant market asks: what is the relevant scope of competition for assessing Plaintiffs' claims? It does so by asking if a hypothetical monopolist of the candidate market could profitably exercise market power. As alleged herein, a hypothetical U.S. monopolist in each of the defined product markets could profitably exercise market power without profit-defeating substitution to foreign dairy producers. The relevant geographic market is therefore constrained to the U.S., and any positive effects of EAP on foreign markets that Defendants may later raise as a defense would be an out-of-market efficiency that is properly excluded from a rule-of-reason analysis. Plaintiffs also allege that the EAP is not redeemed by any pro-competitive justifications, as the following section explains.

## I. Antitrust Injury

### 1. The Export Assistance Program Is Anticompetitive

191. Export subsidies are widely understood to harm competition and the structure of CWT's Export Assistance exacerbates these anticompetitive effects. While a government-funded export subsidy can encourage domestic firms to increase production to some extent, economists

expect such subsidies to overall reduce domestic supply by redirecting goods overseas.[56] This reduces welfare, because there is inefficiently low domestic supply and therefore domestic prices rise above a competitive level, and foreign prices may conversely be inefficiently low—reducing foreign production and potentially harming the competitive process in foreign markets in addition to domestic markets.[57] As a consequence, the World Trade Organization (WTO) explicitly prohibits participating countries from enacting export subsidies on both industrial and agricultural products—recognizing the anticompetitive effects of such policies.[58] In other words, the leading global authority on international trade has concluded that export subsidies have such a pernicious effect on competition that they should be banned outright, and has indeed done so to the full extent of its authority. CWT circumvents this ban because it is not a governmental organization that participates in the WTO and is therefore not bound by its regulations; this distinction yet worsens the anticompetitive effects of CWT's Export Assistance. Indeed, foreign dairy producers have already complained about the competition-distorting effects of CWT's Export Assistance, which, because it is privately financed, escapes the prohibitions on government-financed export subsidies in trade agreements such as the Trans-Pacific Partnership.[59]

---

[56] World Trade Organization, *World Trade Report 2006*, at p. 57, Box 3, https://www.wto.org/english/res_e/booksp_e/anrep_e/wtr06-2c_e.pdf.

[57] *Id.* at pp. 57-58; Sykes, A. O. (2003), *The Economics of WTO Rules on Subsidies and Countervailing Measures*, John M. Olin Law & Economics Working Paper No. 186 (2d series), University of Chicago Law School, at p. 9, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1515&context=law_and_economics.

[58] World Trade Organization, *Export subsidies and other export support measures*, https://www.wto.org/english/tratop_e/agric_e/factsheetagric17_e.htm.

[59] ADIC and Dairy Australia, Submission to the Senate Foreign Affairs, Defence and Trade References Committee (Trans-Pacific Partnership Inquiry) (Oct. 2016), https://www.aph.gov.au/DocumentStore.ashx?id=23b586a3-299b-4f84-9bb0-6141291ab14b&subId=459442 ("dairy farmer funded Cooperatives Working Together (CWT) export subsidy program").

192. Even if government-funded export subsidies had some redeeming qualities, the economic incentives and effects that CWT's EAP creates are yet worse and lack a pro-competitive justification. A government-funded subsidy introduces new money to a specific sector, funded by taxes elsewhere, to encourage production in that sector. EAP introduces no new money to dairy production. It is funded by the dairy farmers themselves in a closed loop. Instead of an external influx of capital to encourage production, EAP is a concerted exchange of funds among horizontal competitors—paying each other to redirect supply from the domestic to foreign export markets without commensurately increasing production. Because EAP acts as a closed loop among competitors, there is no new capital encouraging them to increase production and the primary reason to fund the subsidy is because it is a collusive mechanism, allowing CWT members to increase domestic prices more than it costs them to fund each other's subsidies.

193. This distinction between a government versus a self-funded subsidy further hampers any possible redeeming qualities of an export subsidy, which are already so pernicious the WTO has banned them. In short, if government-funded export subsidies are so anticompetitive that the WTO has banned them outright, then an agreement among horizontal competitors to circumvent the WTO ban and self-fund each other's export subsidies—with the explicitly stated goal of increasing domestic prices—should be viewed with even more scrutiny. That scrutiny is what Plaintiffs seek to achieve through this putative class action.

**2. The Export Assistance Program Inflated Domestic Milk Prices**

194. The effect of Defendants' conduct as described herein has been to artificially inflate the over-order prices of raw milk as well as the prices of butter and cheese, in the United States. By manipulating the supply of cheese through an agreement to conduct and pay for mass exports, prices of raw milk, butter and cheese have been supported at artificially high levels throughout the

United States, and, as a result, purchasers of raw milk, butter, cheese, whole milk powder, cream cheese, and anhydrous milkfat have paid supracompetitive prices.

195. As previously alleged herein, CWT has itself stated that the Export Assistance Program "improves" the balance of supply and demand favoring higher milk prices for dairy farmers. Estimates cited by CWT put the overcharge at as much as $0.50 per hundredweight, and at an average of $0.36 per hundredweight per year over a seven-year period.

196. CWT's own description of how its Export Assistance Program raises domestic dairy prices is consistent with public market data. Using USDA and U.S. Census Bureau data on monthly dairy exports and the all-milk price farmers receive, the alleged mechanism can be seen at work.[60]

197. The line graph below tracks the monthly all-milk price farmers receive, shown in orange against the left axis, and monthly U.S. dairy exports, shown in blue against the right axis. The lighter shading marks the beginning of 2003 to October 2010, when CWT's Export Assistance Program operated alongside its Herd Retirement Program. The darker shading and the red line mark October 2010 onward, when, as alleged herein, CWT shifted its resources to the Export Assistance Program.

198. In addition to depicting the co-movement of export volumes and domestic milk prices over the period, the figure illustrates the behavior of both series around CWT's transition from the Herd Retirement Program to the expansion of the Export Assistance Program. Between

[60] USDA National Agricultural Statistics Service (all-milk price); U.S. Census Bureau trade data via USDA Foreign Agricultural Service, Global Agricultural Trade System (monthly dairy product exports, total weight, world total), https://apps.fas.usda.gov/gats/. The farm price is the all-milk price, the gross price farmers receive per hundredweight of milk sold, including premiums and discounts for quality, quantity and other reasons, shown in dollars per hundredweight as published. Export quantities are converted from kilograms to thousands of metric tons and measure the total weight of all dairy products, not a milk equivalent.

September 2008 and June 2009, the all-milk price fell about 38%, coinciding with a sharp drop in dairy exports and a period when CWT's resources were focused on its Herd Retirement Program. In 2010, as CWT shifted its efforts to export assistance, exports rebounded, and the all-milk price continued to recover to a level similar to, and in later years higher than, that seen under the Herd Retirement Program. Effectively, the Export Assistance Program raised prices through the same economic mechanism as the Herd Retirement Program, conduct that previously led to significant antitrust settlements.




199. The scatter plot reaffirms the relationship between dairy exports and the all-milk price. Each dot represents a month, plotting that month's dairy exports against the all-milk price, and the line is the best-fit line through these dots. The line slopes upward, so months with higher export volumes coincide with higher milk prices: each additional 100 thousand metric tons of monthly exports is associated with an all-milk price about $4.20 per hundredweight higher.

### 3. Price Inflation Caused by the Export Assistance Program Was Passed Through to End Consumers

200. The effect of the supracompetitive prices charged for these products was not limited to the direct purchasers. As raw milk is an essential input for every Relevant Product, the inflated price of raw milk raised the cost of manufacturing and selling these Relevant Products in the United

States. These increases were passed through each stage of the distribution chain to consumers, who purchased these products for their own use. Several features of the market, described below, would have made this pass-through sustainable.

201. Retail milk prices closely track farm milk prices:

a. The U.S. Government Accountability Office analyzed monthly milk prices at the farm, cooperative, wholesale and retail levels in 15 markets from 2000 to 2004 and found that price changes correlated across each level of the marketing chain.[61]

b. During CWT's herd retirement program, retail prices moved nearly one-for-one with farm prices. In Atlanta, Miami, Philadelphia, Pittsburgh, St. Louis, and Kansas City, each $1 increase in the farm price was matched by a retail increase of approximately $1 or more. Retail milk purchasers paid higher prices in nearly every city analyzed, and the share of farm milk price increases passed through to the retail level rose during the program.[62]

c. An analysis of USDA and Bureau of Labor Statistics data shows a strong positive correlation between farm and retail whole milk prices.[63] The line graph below compares the monthly all-milk price farmers receive, shown in orange, with the monthly retail price of whole milk, shown in blue. The shading is consistent with the graphs in

---

[61] U.S. Government Accountability Office, *Dairy Industry: Information on Milk Prices, Factors Affecting Prices, and Dairy Policy Options*, GAO-05-50, Dec. 2004, Appendix II, www.gao.gov/assets/gao-05-50.pdf.

[62] Bolotova, Y., *Fluid Milk Pricing and Market Power in the U.S. Dairy Industry*, 2022, Selected Paper, Agricultural & Applied Economics Association Annual Meeting, Appendix II, Table 1, https://ageconsearch.umn.edu/record/322069/files/22472R2.pdf.

[63] USDA National Agricultural Statistics Service, *Milk, Price Received* (all-milk price, national, monthly), https://quickstats.nass.usda.gov/; U.S. Bureau of Labor Statistics, Average Price Data, series APU0000709112 (whole milk, per gallon), https://fred.stlouisfed.org/series/APU0000709112.

Section IV.I.2. The data confirms that the retail price of whole milk and the all-milk price farmers receive track closely.

d. The scatter graph below plots the same data. Each dot is one month, with that month's farm price on the horizontal axis and the retail price on the vertical axis, and the line is the best-fit line through the dots. There is a strong positive correlation, with a slope of 1.09, meaning that a $1 higher farm price per hundredweight is associated with a $1.09 higher retail price per hundredweight of milk.







202. Other dairy products show similar trends in farm and retail prices.

a. The data for Cheddar cheese and butter show a pattern similar to that for whole milk. The figures below compare the all-milk price farmers receive, as reported by the USDA National Agricultural Statistics Service, with average retail prices for Cheddar and butter, as reported by the Bureau of Labor Statistics. 64 In the line graph, the orange

---

64 USDA NASS, *Milk, Price Received* (national, monthly), https://quickstats.nass.usda.gov/; U.S. Bureau of Labor Statistics, Average Price Data, series APU0000710212 (Cheddar cheese), https://fred.stlouisfed.org/series/APU0000710212, APU0000710111 (butter, through April 2012), https://fred.stlouisfed.org/series/APU0000710111, and APU0000FS1101 (butter, from April 2018), https://fred.stlouisfed.org/series/APU0000FS1101. Retail prices are shown per hundredweight of milk, converting at 10.3 pounds of milk per pound of Cheddar and approximately 19.2 pounds per pound of butter, following USDA ERS methodology. Gaps in the lines reflect months for which BLS published no average price: for butter, June to September 2008

line represents the monthly all-milk price farmers receive, the blue line represents the monthly retail price of Cheddar cheese, and the yellow line represents the monthly retail price of butter. The shading in this graph is consistent with the graphs in Section IV.I.2. Retail prices for both products tend to move in the direction of the all-milk price, with a short lag.

b. The scatter graph plots each month's farm all-milk price against the retail price of each product, and the fitted lines slope upward for Cheddar and for both butter series. In the scatter graph, each blue dot represents one month's retail Cheddar price and each yellow dot represents one month's retail butter price, plotted against that month's all-milk price. The lines are the best-fit lines through each set of dots. The slope of the Cheddar line is 1.26 and the slope of the butter line is 0.69, meaning a $1 higher all-milk price per hundredweight is associated with a $1.26 higher retail Cheddar price and a $0.69 higher retail butter price, per hundredweight of milk.







and May 2012 to March 2018, and for all products, October 2025. Retail prices are expressed per hundredweight of milk so that all three lines share one scale.

c. Peer-reviewed research by economists at USDA's Economic Research Service likewise finds that farm and retail prices for whole milk and Cheddar move together over the long run.[65]

d. Taken together with the relationship between exports and farm milk prices shown above, this evidence is consistent with the mechanism alleged herein: CWT's export program raised farm milk prices, and higher farm prices were in turn reflected in higher retail prices for dairy products.

**4. Demand for the Relevant Products Permitted Pass-Through**

203. Each Relevant Product constitutes a relevant product market because a hypothetical monopolist could profitably impose a small but significant non-transitory increase in price; there are too few consumers that would switch to other products to render such an increase unprofitable. Similarly, sellers at each level of the distribution chain could raise prices in response to the overcharge, without losing significant enough sales to make such an increase unprofitable.

204. Milk, cheese, and butter are household staples with few reasonable substitutes outside their respective categories. Consumers may switch among varieties within a market, but Defendants' conduct, through raising raw milk prices, raised the prices of every variety within each market simultaneously. Retail demand for fluid milk is highly inelastic in every federal milk marketing order region, as confirmed by a study that NMPF itself submitted to the USDA.[66]

---

[65] Hayden Stewart & Don P. Blayney, *Retail Dairy Prices Fluctuate with the Farm Value of Milk*, 40 Agric. & Res. Econ. Rev. 201 (2011), https://ageconsearch.umn.edu/record/117772.

[66] Cakir, M. and Balagtas, J., *Estimating Market Power of U.S. Dairy Cooperatives in the Fluid Milk Market*, Apr. 2012, American Journal of Agricultural Economics, Vol. 94(3), pp. 647-658, at pp. 654–655 and Table 3. Submitted by NMPF as Exhibit NMPF-110 in USDA's national Federal Milk Marketing Order pricing hearing, www.ams.usda.gov/sites/default/files/media/FMMO_NMPF_110.pdf.

205. Retailer bargaining power did not shield consumers from the overcharge. As raw milk is a fungible input common to every Relevant Product, Defendants' conduct raised costs for almost every supplier simultaneously. Accordingly, retailers had few lower-priced alternatives they could turn to. Faced by the same constraints, retailers were not incentivized to absorb the price increases out of their own margins.

206. The relevant product market is the market for dairy products—including but not limited to fluid milk, cheese, butter, yogurt, ice cream, and other products derived from raw milk—sold at retail and wholesale in the United States. The relevant geographic market is the United States, as dairy products compete in a national market. Defendants' coordinated conduct had nationwide effects on dairy prices, as the FMMO pricing formulae transmit wholesale price changes to all regions of the country.

**J. Defendants Are Not Entitled to the Capper-Volstead Act Exemption**

207. The Capper-Volstead Act, passed in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146) (7 U.S.C. §§ 291, 292), grants certain agricultural producers an exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. Capper-Volstead Act, § 1. These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes." *Id.*

208. The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which absent the Act, would run afoul of the Sherman Antitrust Act.

209. Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural

products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

210. Further, Capper-Volstead requires that protected cooperatives be "operated for the mutual benefit of the members thereof" and limits the immunity provided by the Act to cooperatives that afford equal corporate suffrage rights to its members, providing "that no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein." The limited protections of the Capper-Volstead Act evaporate unless the organization engaging in the coordinated efforts is exclusively made up of producers. If even one member of a cooperative organization is not a producer, the limited protection of the Capper-Volstead Act will not apply. Even if an individual producer independently qualifies as a Capper-Volstead entity, that individual producer loses Capper-Volstead immunity upon conspiring with a non-Capper-Volstead entity.

211. The plain language of the Capper-Volstead Act affords no immunity for pre-production output restraints: Congress did not grant the cooperatives the power to restrict supply, only the power to assist producers in marketing the available supply of agricultural products. USDA itself has recognized in various published documents that it is illegal for cooperatives to restrain members' production. The Export Assistance Program orchestrated by CWT and its members sought to restrain the supply of raw milk, eliminate competition and thereby artificially inflate the prices of cheese and other dairy products. CWT and its members, therefore, are not entitled to the protections of the Capper-Volstead Act.

212. The activities of CWT and its members, including Defendants, as described herein, were anticompetitive and predatory. CWT did not collectively process, prepare for market, handle, or market any of the products of its members as required by the Capper-Volstead Act. CWT

performed no activities that promoted market efficiency and had no legitimate business justification for its existence. Its sole purpose was, and remains, to facilitate the conspiracy to reduce the supply of raw farm milk available in the U.S. and drive up the prices of dairy products, like cheese.

213. CWT does not qualify as a Capper-Volstead entity. Members of CWT include non-producers, such as National Farmers Organization, whose membership includes entities that produce no milk.

214. Thus, CWT and its members do not enjoy the limited immunities of Capper-Volstead, and neither does NMPF for having created and conspired with a non-exempt entity.

## V. CLASS ALLEGATIONS

215. Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Class:

> All natural persons and entities who indirectly purchased dairy products (including but not limited to fluid milk, cheese, butter, yogurt, ice cream, and other dairy products) in Counts II and III below, not directly from any Defendant, for personal consumption or end use, from January 1, 2018, through the present (the "Class").

Plaintiffs reserve the right to amend the Class definition and the definitions of any state-specific subclasses as discovery and further investigation warrant.

216. Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

217. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

218. Numerosity – Federal Rule of Civil Procedure 23(a)(1). The members of the Classes are so numerous that individual joinder of all Class members is impracticable. On information and belief, Class members number in the millions of consumers and other end users who purchased dairy products at retail during the Class Period. The precise number or identification of members of the Classes is presently unknown to Plaintiffs but may be ascertained from Defendants' records and third-party transactional data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

219. Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to, the following:

a. Whether the Defendants conspired to restrain trade;

b. Whether the Defendants contracted to restrain trade;

c. Whether the Defendants agreed to restrain trade;

d. Whether the Defendants are entitled to the limited protections of the Capper-Volstead exemption;

e. Whether the Defendants affected interstate commerce by way of the conduct alleged herein;

f. The degree to which Plaintiffs and members of the putative Class were harmed;

g. Whether any injunctive relief may be proper to rectify the harm caused to the Plaintiffs and members of the putative Class;

h. Whether Defendants' overcharges were passed through the distribution chain to indirect purchasers;

i. Whether Plaintiffs and Class members were injured by paying artificially inflated prices for dairy products; and

j. The appropriate measure of damages and overcharges passed through to indirect purchasers.

220. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

221. Typicality – Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' claims are typical of the claims of the other Class members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendants in violation of law as complained of herein. Like all Class members, Plaintiffs purchased dairy products at retail at prices that were artificially inflated by Defendants' anticompetitive conduct, and Plaintiffs' injuries arise from the same unlawful conduct and are based on the same legal theories as the injuries of the Class.

222. Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives of the Classes because they are members of the Classes and their interests do not conflict with the interests of the Class members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of

all Class members. Accordingly, the interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

223. Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive and declaratory relief appropriate respecting the Class as a whole. Plaintiffs seek injunctive relief to prevent Defendants from continuing the unlawful conduct alleged herein and to restore competitive conditions in the market for dairy products.

224. Superiority – Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I:

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
## (15 U.S.C. § 1; Clayton Act § 16, 15 U.S.C. § 26 — Injunctive Relief Only)

225. Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

226. Plaintiffs bring this Count solely for equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, based on Defendants' contract, combination, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs do not seek federal antitrust damages under this Count.

227. Defendants' agreement to restrain trade by coordinating exports and restricting domestic supply of dairy products constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. There is no legitimate, non-pretextual procompetitive business justification for Defendants' conspiracy that outweighs its harmful effects, and any purported justification could have been achieved through substantially less restrictive means.

228. The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators has been furthered and effectuated, among other methods, by the following acts:

a. Prior to the Class Period, dairy prices could not be maintained due to a fluctuating imbalance of supply over demand—after spurts of high prices, producers would add more production capacity and prices would fall again.

b. Against this backdrop, Defendants have acted in concert with competitors, with and through CWT and other trade groups, and with non-member conspirators, and have contracted, conspired, and combined to effectuate a substantial reduction in the domestic supply of raw milk, cheese, butter, and other dairy products through the Export Assistance Program, thereby causing supracompetitive price increases throughout the distribution chain and at retail.

c. Defendants have conspired to substantially reduce the domestic dairy supply through frequent mass exports of cheese and other dairy products through the

Export Assistance program. These actions are extraordinary, non-competitive, and contrary to economic fundamentals.

d. To maintain their overarching conspiracy to restrain output and production and to thereby raise the over-order prices of raw milk, butter, and cheese to supracompetitive levels, Defendants have taken significant steps throughout the Class Period, which have resulted in supracompetitive prices for raw milk, cheese, and butter throughout the Class Period.

229. The conspiracy has had its intended effect, as Defendants benefit from supply constraints on dairy products and the reduction of competition, which artificially inflate the prices of raw milk, butter, cheese, and other dairy products, as described herein.

230. As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have suffered and continue to face threatened loss and damage in the form of artificially inflated prices for dairy products purchased at retail. Plaintiffs therefore seek injunctive and other equitable relief to prevent and restrain Defendants from continuing their unlawful conduct and to remedy its ongoing effects.

**COUNT II:**

**VIOLATION OF STATE ANTITRUST STATUTES**
**(Illinois Brick Repealer States)**

231. Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

232. Defendants' contract, combination, and conspiracy in restraint of trade violated the antitrust statutes of states that permit recovery by indirect purchasers, including Arizona (Ariz. Rev. Stat. § 44-1408); Arkansas (Ark. Code Ann. § 4-75-315); California (Cal. Bus. & Prof. Code §§ 16720, 16750); Colorado (Colo. Rev. Stat. § 6-4-114); Connecticut (Conn. Gen. Stat. § 35-

46a); District of Columbia (D.C. Code § 28-4509); Florida (Fla. Stat. § 542.21 et seq.); Hawaii (Haw. Rev. Stat. § 480-14); Illinois (740 ILCS 10/7); Iowa (Iowa Code § 553.12); Kansas (Kan. Stat. Ann. § 50-161); Maine (Me. Rev. Stat. Ann. tit. 10, § 1104); Maryland (Md. Code Ann., Com. Law § 11-209); Michigan (Mich. Comp. Laws § 445.778); Minnesota (Minn. Stat. § 325D.57); Mississippi (Miss. Code Ann. § 75-21-9); Nebraska (Neb. Rev. Stat. § 59-829); Nevada (Nev. Rev. Stat. § 598A.210); New Hampshire (N.H. Rev. Stat. Ann. § 356:11); New Mexico (N.M. Stat. Ann. § 57-1-3); New York (N.Y. Gen. Bus. Law § 340); North Carolina (N.C. Gen. Stat. § 75-16); North Dakota (N.D. Cent. Code § 51-08.1-08); Oregon (Or. Rev. Stat. § 646.780); Rhode Island (R.I. Gen. Laws § 6-36-11); South Dakota (S.D. Codified Laws § 37-1-33); Tennessee (Tenn. Code Ann. § 47-25-106); Utah (Utah Code Ann. § 76-10-3109); Vermont (Vt. Stat. Ann. tit. 9, § 2465); Virginia (Va. Code Ann. § 59.1-9.12); West Virginia (W. Va. Code § 47-18-9); and Wisconsin (Wis. Stat. § 133.18).

233. As a direct and proximate result of Defendants' violations of the foregoing state antitrust statutes, Plaintiffs and Class members paid supracompetitive prices for dairy products, and the overcharges caused by Defendants' conduct were passed through the distribution chain to Plaintiffs and Class members as indirect purchasers.

234. Plaintiffs and Class members seek damages, including treble damages where authorized, together with attorneys' fees, costs, injunctive relief, and all other relief available under the foregoing state antitrust statutes.

**COUNT III:**

**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**

235. Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

236. Defendants' anticompetitive conduct constitutes unfair and/or deceptive trade practices in violation of state consumer protection statutes, including but not limited to Alaska (Alaska Stat. § 45.50.471 et seq.); Arizona (Ariz. Rev. Stat. § 44-1522 et seq.); Arkansas (Ark. Code Ann. § 4-88-101 et seq.); California (Cal. Bus. & Prof. Code § 17200); District of Columbia (D.C. Code § 28-3901 et seq.); Florida (Fla. Stat. § 501.204); Georgia (Ga. Code Ann. § 10-1-390 et seq.); Illinois (815 ILCS 505/2); Indiana (Ind. Code § 24-5-0.5-1 et seq.); Louisiana (La. Rev. Stat. Ann. § 51:1401 et seq.); Maine (Me. Rev. Stat. Ann. tit. 5, § 205-A et seq.); Maryland (Md. Code Ann., Com. Law § 13-101 et seq.); Massachusetts (Mass. Gen. Laws ch. 93A, § 1 et seq.); Michigan (Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.68 et seq.); Mississippi (Miss. Code Ann. § 75-24-1 et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); Nebraska (Neb. Rev. Stat. § 59-1601 et seq.); Nevada (Nev. Rev. Stat. § 598.0903 et seq.); New Hampshire (N.H. Rev. Stat. Ann. § 358-A:1 et seq.); New Mexico (N.M. Stat. Ann. § 57-12-1 et seq.); New York (N.Y. Gen. Bus. Law § 349); North Carolina (N.C. Gen. Stat. § 75-1.1 et seq.); Oregon (Or. Rev. Stat. § 646.605 et seq.); Pennsylvania (73 Pa. Stat. Ann. § 201-1 et seq.); Rhode Island (R.I. Gen. Laws § 6-13.1-1 et seq.); South Carolina (S.C. Code Ann. § 39-5-10 et seq.); South Dakota (S.D. Codified Laws § 37-24-1 et seq.); Texas (Tex. Bus. & Com. Code § 17.41 et seq.); Utah (Utah Code Ann. § 13-11-1 et seq.); Vermont (Vt. Stat. Ann. tit. 9, § 2451 et seq.); Virginia (Va. Code Ann. § 59.1-196 et seq.); West Virginia (W. Va. Code § 46A-6-101 et seq.); Wisconsin (Wis. Stat. § 100.18 et seq.); and Wyoming (Wyo. Stat. Ann. § 40-12-101 et seq.).

237. Defendants' conduct was unfair, deceptive, and/or unconscionable because it artificially inflated the prices of essential consumer goods through collusive supply manipulation and concealed from consumers that retail dairy prices were being distorted by coordinated export and supply-restriction conduct.

238. As a direct and proximate result of Defendants' unfair and/or deceptive conduct, Plaintiffs and Class members suffered ascertainable loss by paying artificially inflated prices for dairy products purchased at retail and are entitled to damages, restitution, disgorgement, injunctive relief, attorneys' fees, and all other relief available under applicable state law.

**COUNT IV:**

**UNJUST ENRICHMENT**

239. Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

240. Defendants have been unjustly enriched at the expense of Plaintiffs and Class members by receiving supracompetitive prices for dairy products as a result of their anticompetitive conduct.

241. It would be inequitable for Defendants to retain the benefit of those overcharges, and Plaintiffs and Class members therefore seek restitution, disgorgement, and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Class members pray for the following relief:

A. Certification of the Action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B. The conduct alleged be adjudged and decreed to violate Section 1 of the Sherman Act, applicable state antitrust statutes, applicable state consumer protection statutes, and principles of unjust enrichment;

C. A judgment for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties, restitution, disgorgement, and other monetary relief provided by applicable law, including treble damages under applicable state statutes;

D. An order requiring Defendants to disgorge all ill-gotten gains and to make restitution to Plaintiffs and the Class to the fullest extent permitted by law;

E. That the Court award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the service of the initial Complaint in this Action;

F. The costs of this suit, including reasonable attorneys' fees, expert fees, and expenses to the extent provided by law;

G. Such declaratory, injunctive, and equitable relief as is appropriate to remedy and prevent the continuing effects of Defendants' violations of federal and state law; and,

H. Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs on behalf of themselves and all others similarly situated hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38 on any and all claims so triable.

DATED: October 5, 2026

Respectfully submitted,

*/s/ Marc C. Greco*
Marc C. Greco (Bar No. 41496)
Kip A. Harbison (Bar No. 38648)
**GLASSER AND GLASSER, P.L.C.**
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
Telephone: (757) 625-6787
*marcg@glasserlaw.com*
*kip@glasserlaw.com*

Steve W. Berman*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
*steve@hbsslaw.com*

Raffi Melanson*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
*raffim@hbsslaw.com*

Blake Hunter Yagman*
**YAGMAN PLLC**
626 RexCorp Plaza, Suite 605
Uniondale, New York 11556
Telephone: (929) 709-1493
*blake.yagman@yagmanpllc.com*

*Pro hac vice application to be filed

***Attorneys for Plaintiffs and the Proposed Classes***